UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DK LIPA LLC,

            Plaintiff,

   -against-

MISF Solar LLC, Project NY LLC, Mastic Industrial
Solar LLC, Gerald Rosengarten, Howard
Rosengarten, Sion Sohayegh, Bijoun Kaypour, Artur
Madej, Thomas Falz, Ulrich Falz, and Markus Falz.

            Defendants.

No: 20-cv-4273

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

       Plaintiff DK LIPA LLC ("DK LIPA"), by its attorneys Mandel Bhandari LLP, for its complaint against MISF Solar LLC ("MISF Solar"), Project NY LLC ("Project NY"), Mastic Industrial Solar LLC ("Mastic"), Gerald Rosengarten, Howard Rosengarten, Sion Sohayegh, Bijoun Kaypour, Artur Madej, Thomas Falz, Ulrich Falz, and Markus Falz (collectively, "Defendants") alleges as follows:

## NATURE OF THE ACTION

       1.    This is an action against the individuals and companies that secretly orchestrated the fraudulent transfer of assets from Sybac Solar LLC (currently known as "SB Energy Holdings LLC") in order to deprive DK LIPA of its rights pursuant to an October 11, 2013 Right of First Offer Agreement (the "Agreement") between DK LIPA and Sybac.

       2.    The actions by the Defendants constitute tortious interference with the Agreement between DK LIPA and Sybac and give rise to alter ego and fraudulent transfer claims.

       3.    The Agreement (attached as Exhibit A to this Complaint) provided DK LIPA with a right of first refusal to develop a solar energy facility (the "Project") utilizing the Power

Purchase Agreements ("PPA")s with the Long Island Power Authority identified by the following designations:  (i) PPA PAM – 2013-2176; (ii) PPA PAM – 2013-2177; and (iii) PPA PAM – 2013-197R21

4.     Sybac breached the Agreement because the owners or equitable owners of Sybac caused Sybac to transfer the Project to an entity called MS Solar LLC for $10 on July 28, 2017, without providing DK LIPA with its right of first refusal.

5.     This was clearly a fraudulent transfer because the PPAs were worth millions of dollars and Sybac only received $10 in exchange for the Project.

6.     Moreover, the transfer of the Project was made with the actual intent to hinder, delay or defraud DK LIPA.

7.     Indeed, at the time the transfer was made, the Defendants **knew** that by violating the terms of the ROFO, they would be exposing Sybac to a breach of contract claim worth millions of dollars.

8.     On June 3, 2016, Artur Madej, a member of Sybac at the time, wrote an email to Markus Falz and Thomas Falz in which he stated:

> I forgot to mention that [Gerald Rosengarten] is aware of the DK LIPA litigation.  I gave him the short version of the deal history and told him we would have to offer DKL[ ]30 days the right to match any offer we receive….You cannot change this deal once you offer it to DKL…They have been extremely litigious…and will make sure you adhere to the transaction once their 30 day matching period is over.

9.     On the same date, Madej warned Markus and Thomas Falz again, writing "Don't forget the DK Lipa issue…They will litigate 100% guaranteed."

10.     The Defendants never forgot about the "DK LIPA issue," instead they intentionally took unlawful steps to (i) conceal their actions, (ii) thwart DK LIPA's rights, and

2

(iii) render Sybac unable to satisfy a judgment to DK LIPA – if the unlawful transfer was ever discovered.

11.     This is, unfortunately, the ***third*** case that DK LIPA has had to file to try to vindicate its rights under the ROFO because Defendants have desperately tried to conceal their actions.

12.     In the first case, <u>DK LIPA LLC v. Sybac Solar LLC</u>, Case No. 15-cv-6471 (JPO) ("Sybac I"), DK LIPA obtained a TRO and preliminary injunction enjoining Sybac from from "accepting any offers for the purchase, acquisition, or financing of the Project or Site described in the October 11, 2013 Right of First Offer Agreement between DK LIPA and Sybac." [Sybac I, Dkt.#36 at 6].

13.     During a hearing before the Court on December 23, 2015, Sybac's counsel reiterated Sybac's purported commitment to abiding by Section 8 of the Agreement:

- "And we are clearly understanding of the fact that if we do get a third-party offer that we have to present it to them within three days and they have to – they have 30 days in order to match that." [Sybac I, Dkt.#65: transcript Dec. 23, 2015 8:23-9:2]

- "...and they are protected under paragraph eight, then we can't just sell it to any third party. We have to give them an opportunity to match it.  There is simply no fear and no basis whatsoever that we're going to run out and sell it to a third party and try to undermine them." [*Id.* 23:5-10.]

14.     This Court credited Sybac's representation at the hearing, observing that "They're not going to.  They're not going to sell it to a third party.  There is no threat of that." [*Id.*]

15.     On January 5, 2016, this Court lifted the preliminary injunction, finding that

"Sybac has not threatened to breach that provision [Section 8] and, for the reasons explained on the record at the December 23, 2015 conference, damages for a breach of §8 are easier to calculate than damages for a breach of §2....While Sybac is no longer subject to the preliminary injunction, it of course remains subject to the requirements of §8 of the ROFO Agreement." [Sybac I, Dkt.#61]

16.     The statements made by Sybac to the Court were not true.

17.     Through public filings and news articles, DK LIPA learned that in November 2016, Sybac signed a letter of intent with MISF to develop a solar project in Brookhaven, New York that includes the same three PPAs, for 9.9 MWp AC, that were the subject of the Agreement.

18.     On the basis of that publicly available information, on February 13, 2019, DK LIPA filed a lawsuit in the SDNY against Sybac, now known as SB Energy Holdings LLC, and against MISF for breach of contract and tortious interference with contract ("SYBAC II").[1]

19.     To be clear, the November 2016 letter of intent was never provided to DK LIPA despite (i) Sybac's representations to the Court in Sybac I; and (ii) Madej's June 2016 admission that any such offer would have to be shared with DK LIPA.

20.     In SYBAC II, Sybac moved for dismissal, arguing among other things that the Project was "**self-developed**" so it was not the type of transaction that could violate the ROFO.[2]

21.     During discovery in SYBAC II, DK LIPA has learned the project was not, in fact self-developed, that several other individuals and entities participated in the tortious interference with DK LIPA's contract, and that those entities and individuals financially benefited from

---

[1] *See DK LIPA LLC v. SB Energy Holdings LLC (formerly known as Sybac Solar LLC) and MISF, LLC* 19 Civ. 1405 (LGS).
[2] *Id.,* at Dkt. #32, p. 1.

tortuously interfering with DK LIPA's contract.

22.     As DK LIPA has learned from documents obtained in Sybac II, in July 2017, Sybac transferred the Project to MISF Solar, which is owned 50/50 by two other entities: Project NY and Mastic.  Sybac does not own any portion of MISF Solar.  Thus, the Project is not being "**self-developed**" by Sybac.

23.     DK LIPA has also learned that the individual owners of Project NY LLC and Mastic Industrial Solar LLC were aware of the ROFO and aware that Sybac intended to abide by the requirement to offer any deal to DK LIPA.

24.     In this action, DK LIPA seeks damages from the Defendants who tortuously interfered with DK LIPA's rights and orchestrated the unlawful transfer of Sybac's most valuable asset to MISF Solar.

## **PARTIES**

25.     Upon information and belief, MISF Solar LLC is owned by Project NY LLC and Mastic Industrial Solar LLC.

26.     Upon information and belief, Project NY LLC's members are Thomas Falz and Markus Falz.  Upon information and belief, Thomas Falz resides in Germany and Markus Falz resides in Florida.

27.     Upon information and belief, Sybac's alter egos were Thomas Falz, Markus Falz, Ulrich Falz, and Artur Madej.  Upon information and belief, Artur Madej resides in Florida. Upon information and belief, Ulrich Falz is a resident of Germany.

28.     Upon information and belief, Mastic Industrial Solar's members are Gerald Rosengarten, Howard Rosengarten, Sion Sohayegh, and Bijoun Kaypour.  Upon information and belief, all four of those individuals reside in New York.

5

29.     DK LIPA LLC's members are residents of Illinois, Connecticut, and California.

## JURISDICTION AND VENUE

30.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that (a) Plaintiff is a resident of Illinois, Connecticut, and California, and Defendants are residents of New York, Florida and Germany, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.  Although DK LIPA does not know what MISF paid for the Project, the previous third-party offer presented by Sybac was for $42,625,000.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim – including the negotiation of the Agreement – took place in New York, New York.

32.     Section 5 of the Agreement provides that "The laws of the State of New York shall govern the interpretation, validity, performance and enforcement of this Agreement."

## FACTUAL ALLEGATIONS

### A. The Agreement

33.     On October 11, 2013, DK LIPA and Sybac entered into the Agreement.  As stated in the Agreement, Sybac intended to develop a solar energy project on Long Island and sell the power output to LIPA.

34.     In the Recitals of the Agreement, "Project" is defined as follows:  "Sybac is developing a photovoltaic solar energy generating project located on Long Island, New York with an intended power rating of 9.9 MWp AC (the "Project")."  The definition of "Project" does not refer to a specific site or parcel of land.

35.     "Site" is defined separately:  "Sybac intends to acquire a parcel of approximately 45.0 acres in Brookhaven, Long Island, in the State of New York (the "Site")."

36.     The Recitals then explain that "Sybac desires to grant DK LIPA certain rights with respect to the Project and DK LIPA desires to accept such rights, as further described below."

37.     The definition of "Laws" includes the applicable statutes, laws, rules, ordinances and regulations of any "county, city or other political subdivision thereof on which the Site is located…"

38.     Under Section 4 of the Agreement, DK LIPA made an initial payment to Sybac upon the execution of the Agreement by depositing $25,000 into an escrow account.  Under the terms of Section 4, this payment would have been applied to the purchase price of the "Project" had the Purchase Agreement been executed.

39.     The Agreement gave DK LIPA an Exclusivity Period in which to negotiate a Purchase Agreement and contract for the provision of certain engineering, procurement and construction services (an "EPC Contract") with Sybac.  Pursuant to Section 2 of the Agreement, this Exclusivity Period would run until 30 days after the day on which Sybac delivered to DK LIPA executed versions of (i) a project interconnection agreement, under which the power produced by the Project could be connected to a utility grid; (ii) a project power purchase agreement (a "PPA"), under which LIPA agreed to buy the power output from the Project; and (iii) an option to purchase the Site from its current owner.

40.     Section 2 of the Agreement expressly states that during the Exclusivity Period, "Sybac, its affiliates, and its respective officers, directors, employees or agents shall not directly or indirectly shall not [sic] accept any offers or proposals for the purchase, acquisition or financing of the Project."

41.     Until the termination of the Exclusivity Period, the parties were supposed to

negotiate and finalize a Purchase Agreement and EPC Contract.  Section 3(a) of the Agreement expressly gives DK LIPA the right to conduct diligence during the Exclusivity Period.

42.     Section 7(a) of the Agreement provides that the Agreement is terminated if the Exclusivity Period expires before the parties successfully come to terms on a Purchase Agreement and EPC Contract.

43.     Section 8 of the Agreement provides an ongoing right of first refusal in the event of termination:

> "Effect of Termination.  In the event of a termination under Paragraph 7(a) above, for 36 months following termination of the Agreement, Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA.  Following receipt of such notification and for 30 days thereafter, DK LIPA shall have a one-time right to enter into and execute an EPC Contract or Purchase Agreement under terms identical in every respect to the terms agreed upon as between Sybac and the other party, except that DK LIPA may elect to modify the total consideration paid to Sybac under those agreements to be the Purchase Price.  This paragraph shall survive the termination of this Agreement."

44.     Section 5 of the Agreement provides that in the event of litigation arising out of the Agreement, the "substantially prevailing party" is entitled to attorneys' fees.

**B.  This Court Enjoins Sybac from Shopping the Project to Third Parties without First Complying with Section 3 of the Agreement**

45.     On June 12, 2015, Sybac sent DK LIPA a purported notice of termination, stating that, "Pursuant to Section 7(a), DK LIPA was required to deliver an executed Purchase Agreement and EPC Contract within the Exclusivity Period.  The Exclusivity Period has passed and the delivery of the documents never occurred."

8

46.     The same day, Sybac simultaneously sent DK LIPA a letter giving notice that it had received a competing offer to purchase the Project from a third party.  The letter stated, "Pursuant to Section 8 of the Agreement, you have thirty (30) days from the date of this letter to match the offer on terms identical in every respect to the terms agreed to by Sybac and the third party.  A copy of the offer is attached to this letter."

47.     Sybac sent this letter even though it had failed to provide the documents it was required to send to DK LIPA before the clock on the expiration of the Exclusivity Period even began to run.

48.     DK LIPA corresponded with Sybac in an effort to obtain the necessary documents, but Sybac refused to provide them.  Nonetheless, on July 22, 2015, Sybac sent DK LIPA a letter stating that because DK LIPA had not matched the offer in the Letter of Intent, "be advised that DK LIPA's one-time right to present a matching offer has expired as of the date of this notice." On July 31, 2015, Sybac told DK LIPA that it would have no further communication with DK LIPA concerning the Project.

49.     On August 17, 2015, DK LIPA filed a Complaint in this Court seeking to stop Sybac from encumbering or selling the project while the Exclusivity Period was still in effect. [Sybac I, Dkt.#1]

50.     On August 18, 2015, this Court granted a Temporary Restraining Order ("TRO") restraining and enjoining Sybac from "(i) accepting any offers or proposals for the purchase, acquisition or financing of the Project or Site, and (ii) taking any steps to encumber or sell the Project or Site, at least until the hearing set forth above, at which time plaintiff's request that defendant be preliminarily enjoined from accepting any offers or proposals for the purchase, acquisition or financing of the Project or Site during the pendency of this case is addressed."

9

[Sybac I, Dkt.#6]

51.      On October 10, 2015, this Court granted a Preliminary Injunction against Sybac. Finding Sybac's arguments "unpersuasive," the Court held that by "taking the positions it took, Sybac denied DK LIPA the benefit of the final 30 days of the Exclusivity Period."  [Sybac I, Dkt.#36 at 3-5].  This Court further held that "there is a risk Sybac will either (1) accept a third party's offer for the Project or (2) insist that DK LIPA match a third party offer pursuant to § 8 of the ROFO Agreement." [Sybac I, Dkt.#36 at 5] The Court therefore enjoined Defendant Sybac from "accepting any offers for the purchase, acquisition, or financing of the Project or Site described in the October 11, 2013 Right of First Offer Agreement between DK LIPA and Sybac." [Sybac I, Dkt.#36 at 6]

**C. Sybac Repeatedly Represents to this Court That it Will Abide by Section 8 of the Agreement**

52.      In December 2015, Sybac moved to have the preliminary injunction lifted, arguing that an injunction was no longer necessary because it had complied with Sections 2 and 3 of the Agreement, the Exclusivity Period had expired, and DK LIPA continued to retain its rights under Section 8.

53.      Notably, among the documents Sybac was required to provide under the Agreement were the PPAs.  Sybac did provide three PPAs: 2013-2176 (.5 MW) 2013-2177 (.5MW), and 2013-197 (8.95 MW).  These three PPA's totaled the 9.9 MWp AC discussed in the Agreement.  The PPA's state that they are for Projects 1, 2, and 3.

54.      In opposing Sybac's motion, DK LIPA expressed its fear that "Without a preliminary injunction, Sybac might choose to sell the project to a third party without giving DK LIPA an opportunity to match." [Sybac I, Dkt.#55]  DK LIPA was "willing to terminate the Exclusivity Period as long as long as it gets a chance to match a good faith offer for the project

pursuant to Section 8 of the ROFO.  Until then, DK LIPA respectfully requests that the

preliminary injunction remain in place." [Id]

55.     In response, Sybac repeatedly assured this Court that it understood and would

abide by its obligations under Section 8 of the Agreement.  Sybac wrote to the Court: "Should

the Court decide to lift the Preliminary Injunction and declare that the parties are now operating

under Section 8 of the ROFO, Sybac fully intends to deliver any third party offers that it

receives."  [Sybac I, Dkt.#56]

56.     During a hearing before this Court on December 23, 2015, Sybac's counsel

reiterated Sybac's purported commitment to abiding by Section 8 of the Agreement:

- "And we are clearly understanding of the fact that if we do get a third-party offer
  that we have to present it to them within three days and they have to – they have
  30 days in order to match that."  [Sybac I, Dkt.#65: transcript Dec. 23, 2015 8:23-
  9:2]

- "...and they are protected under paragraph eight, then we can't just sell it to any
  third party. We have to give them an opportunity to match it.  There is simply no
  fear and no basis whatsoever that we're going to run out and sell it to a third party
  and try to undermine them." [*Id*. 23:5-10.]

57.     This Court credited Sybac's representation at the hearing, observing that "They're

not going to.  They're not going to sell it to a third party.  There is no threat of that." [*Id*.]

58.     On January 5, 2016, this Court lifted the preliminary injunction, finding that

"Sybac has not threatened to breach that provision [Section 8] and, for the reasons explained on

the record at the December 23, 2015 conference, damages for a breach of §8 are easier to

calculate than damages for a breach of §2....While Sybac is no longer subject to the preliminary

11

injunction, it of course remains subject to the requirements of §8 of the ROFO Agreement."
[Sybac I, Dkt.#61]

### D.  In 2016, Sybac and MISF Agree to Develop the Project

59.     Public filings show that Sybac and MISF executed a Letter of Intent on November 14, 2016 to develop a solar project in Brookhaven.

60.     The Letter of Intent identifies three PPAs by number. These are the exact same PPA's – 2013-2176 (.5 MW) 2013-2177 (.5MW), and 2013-197 (8.95 MW), for a total of 9.9 MWp AC – that Sybac presented to DK LIPA.

61.     The Site Sybac originally proposed to DK LIPA and that is identified in the PPAs is Northwood Property, Moriches Middle Island Road.

62.     The Site described in the Letter of Intent between Sybac and MISF is the south side of Moriches-Middle Island Road to the east of Cranford Boulevard.

63.     On information and belief, the two properties are across the street from one another.

64.     Also included in the public filings is a letter from PSEG Long Island (LIPA's successor) stating that Sybac is "authorized to relocate the *Projects* to another location [sic] Moriches Middle Island Road." (emphasis added)

### E.  Sybac Communicates its Intention to Honor DK LIPA's Section 8 Rights

65.     On December 14, 2015, a Sybac employee, Artur Madej, wrote an email to Defendants Markus Falz, Ulrich Falz, and Thomas Falz, in which he reminded all three that: "We cannot partner YET until DK LIPA has had an opportunity to match the terms of a third-party offer."

66.     Gerald Rosengarten is one of the owners of the site to which the Project was relocated.  He is also one of the owners of Mastic Industrial Solar and is therefore an indirect

owner of MISF Solar.  On information and belief, on June 1, 2016 Artur Madej had a phone call

with Gerald Rosengarten during which the two discussed the situation with DK LIPA.  On June

3, 2016, Artur Madej wrote an email to Markus Falz and Thomas Falz in which he stated:

> I forgot to mention that [Gerald Rosengarten] is aware of the DK LIPA litigation.  I gave
> him the short version of the deal history and told him we would have to offer DKL[ ]30
> days the right to match any offer we receive….You cannot change this deal once you
> offer it to DKL…They have been extremely litigious…and will make sure you adhere to
> the transaction once their 30 day matching period is over.

67.     On the same date, Madej warned Markus and Thomas Falz again, writing "Don't

forget the DK Lipa issue…They will litigate 100% guaranteed."

68.     In 2017, the Rosengartens and Falz's exchanged several draft joint venture

agreements to develop the Project.   During these negotiations, counsel for Sybac wrote an email

dated July 24, 2017.  That email was addressed to, among others, Thomas Falz, Markus Falz, and

Ulrich Falz as well as Adam Rosen, who represented Sybac's counterparties in the negotiation –

the Rosengartens, Sion Sohayegh, and Bijoun Kaypour.  In that email, Sybac's counsel wrote in

no uncertain terms: "IMPORTANTLY, all three documents the Lease Agreement, JV and LLC

Agreement should ALL be dated the same date and will be presented to DK LIPA within 3 days

after execution."

### F.  Defendants Reach an Agreement to Develop the Project

69.     Defendants' negotiations continued into 2018.  They finalized their Joint Venture

agreement  ("JV Agreement") in a document dated as of August 31, 2018.

70.     The parties to that Joint Venture Agreement were MISF Solar, Mastic, and Project

NY.

71.     Mastic is owned by Gerald Rosengarten, Howard Rosengarten, Sion Sohayegh,

and Bijoun Kaypour.

72.     Project NY LLC is owned by Markus Falz and Thomas Falz.

73.     Per the recitals in the JV Agreement, Project NY and Mastic agreed to "collaborate on the development, construction and operation of approximately up to 19.6 MW DC power solar array (the "Project")…"  MISF Solar would own the Project and Project NY and Mastic would each have a 50% interest in MISF Solar.

74.     Under the Joint Venture Agreement, Sybac had no ownership interest in the Project.

75.     Under the Agreement, Sybac and Project NY contributed the PPAs and interconnection agreements.  Per the agreement, Sybac would continue as the Engineering, Procurement and Construction ("EPC") contractor, for which it would be compensated.[3]

76.     In Section 8.01(g) of the JV Agreement, Project NY indemnified Mastic and certain other parties for "any Action by DK LIPA LLC or its Affiliates arising from or relating to a certain Right of First Offer Agreement between DK LIPA LLC and Sybac Solar dated October 11, 2013."

77.     Sybac signed the JV Agreement.

**G.  Defendants Fail to Provide any Notice to DK LIPA As Required by the ROFO**

78.     Section 8 of the Agreement provides that for 3 years following termination of the Agreement, Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA.  DK LIPA would then have a 30-day window to exercise its right of first refusal.

---

[3] This arrangement was similar to that contemplated in the ROFO, whereby DK LIPA would develop the Project, but Sybac would provide EPC services.

79.     The Agreement terminated no earlier than December 31, 2015.

80.     The JV Agreement was dated as of August 31, 2018, less than three years after the Agreement terminated.

81.     The project addressed in the Letter of Intent is the same "Project" covered by the Agreement, specifically a photovoltaic solar energy generating project located in Long Island, New York with an intended power rating of 9.9 MWp AC.

82.     In breach of Section 8 of the Agreement, Sybac did not provide DK LIPA with the written offer, nor did Sybac provide DK LIPA with an opportunity to exercise its right of first refusal.

## H.  Defendants Were Aware of the Agreement and Intentionally Induced Sybac to Breach It

83.     As set forth above, Defendants Markus Falz, Thomas Falz, Ulrich Falz, Project NY, Mastic, Gerald Rosengarten, Howard Rosengarten, Sion Sohayegh, and Bijoun Kaypour were told by Artur Madej, either directly or through their agent, that Sybac was required to and would provide DK LIPA with notice and an opportunity to match pursuant to the ROFO.

84.     Moreover, Defendants on the Mastic side, Gerald Rosengarten, Howard Rosengarten, Sion Sohayegh, and Bijoun Kaypour, negotiated for and obtained a provision in the JV Agreement indemnifying them from any claims by DK LIPA pursuant to the ROFO.

85.     Therefore, all of the Defendants were on notice of DK LIPA's rights and the likelihood that DK LIPA could sue to enforce their rights.

86.     Yet Defendants signed the final Joint Venture agreement and related contracts and moved forward with construction within days of finalizing the deal terms, allowing no time for DK LIPA to be provided notice and thirty days to match.  Moreover, months before Defendants signed the agreements, they had already transferred the PPAs and interconnection agreements for

the Project to MISF Solar LLC.

87.     Defendants knew and intended that DK LIPA not be provided an opportunity to exercise its ROFO, and acting either individually or in concert, Defendants caused Sybac not to give DK LIPA notice of the proposed transaction and an opportunity to match it.

**I.   Defendants Personally Benefitted from Inducing Sybac to Breach**

88.     All of the Defendants personally benefited from inducing Sybac to breach.

89.     Under the JV Agreement, Sybac retained no ownership interest in the Project. Sybac's primary remaining interest was as the EPC provider.  The ROFO with DK LIPA also contemplated that Sybac would be the EPC provider.  In other words, as a result of the breach, Sybac did not receive anything – except liability in a lawsuit – that it could not have otherwise obtained had it given DK LIPA the right to match and DK LIPA instead developed the project.

90.     However, as the owners of Project NY, the Falz family stood to gain tremendously from the transaction.  Solar development projects like the instant one provide developers with massive tax credits.  The tax credits for the Project likely totaled millions of dollars.

91.     In other words, by inducing Sybac to breach, the Falz family was not acting in Sybac's interest, but in its own interest, reaping millions in tax credits via their new entity, Project NY, while knowingly exposing Sybac to a lawsuit.  They did so through control of their new entity, Project NY, which became a 50% owner of the Project.

92.     Sybac recently wrote to the Court in SYBAC II to request that the Court expedite review of its motion to dismiss as the costs of the litigation, combined with the COVID-19 crisis, were threatening its ability to continue operating.

93.     The Falz Family knew that DK LIPA was likely to sue if Sybac breached the ROFO;  Artur Madej had warned them of as much.  Yet they knowingly exposed Sybac to the

cost of litigation and potential for insolvency for no benefit other than to their individual pockets via their separate entity, Project NY.

94.     With respect to Ulrich Falz, an email from Markus to Ulrich in 2016 asks whether Ulrich was willing to invest in the Project and the 2017 drafts of the MISF Solar, LLC JV Agreement list Ulrich as a co-manager of MISF Solar LLC.

95.     Thus, Ulrich Falz is an equitable owner of MISF LLC because he exercises control of the business and has a familial interest.

96.     Similarly, Defendants Mastic, Howard Rosengarten, Gerald Rosengarten, Sion Sohayegh, and Bijoun Kaypour stood to benefit from the breach as they too obtained a massive tax credit via their ownership of the Project as well as other financial benefits.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against all Defendants)**

97.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every paragraph in this Complaint as if fully set forth herein.

98.     Sybac and DK LIPA are parties to the Agreement.

99.     The Agreement is a valid contract.

100.    On information and belief, Defendants had knowledge of the Agreement.

101.    Defendants nonetheless procured Sybac's breach of the contract without justification.

102.    DK LIPA has suffered damages a direct result of Defendants' actions.

## COUNT TWO
## BREACH OF CONTRACT
### (Against Project NY, Artur Madej, Thomas Falz, Ulrich Falz, and Markus Falz as Alter Egos of SB Energy Holdings LLC (formerly known as Sybac Solar LLC))

103.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every paragraph in this Complaint as if fully set forth herein.

104.   As set forth herein, Sybac breached the ROFO.

105.   DK LIPA performed all its obligations under the ROFO.

106.   At the time Sybac breached the ROFO, Sybac was the alter ego of Artur Madej, Thomas Falz, Ulrich Falz, and Markus Falz ("Sybac Defendants").

107.   They controlled Sybac and used the corporate form to perpetrate a fraud on DK LIPA.

108.   The Sybac Defendants exercised considerable authority over Sybac and acted as though the company's assets were theirs to manage and distribute.

109.   The Sybac Defendants were Sybac's owners or equitable owners.

110.   The owners and equitable owners of Sybac and Project NY treated the two companies as a single entity.

111.   As an example of this, Sybac transferred PPAs worth millions of dollars to MISF Solar for $10.  Sybac received no ownership interest in MISF Solar despite transferring this valuable asset.

112.   Instead, in consideration for Sybac's transfer of the PPAs, Project NY received a 50% ownership stake in MISF Solar.

113.   Another example of the owners and equitable owners of Project NY and Sybac treating the two companies as a single entity, in Sybac II, Sybac repeatedly told the Court that the Project was being "self-developed."

18

114.    The only way to construe the Project as being self-developed is because Sybac and Project NY are alter egos of each other.

115.    DK LIPA has suffered damages a direct result of Defendants' actions.

**COUNT THREE**
**(Unlawful Transfer Pursuant to N.Y. Debt. Cred. Law §§ 273, 274, 275, 276, 276-a)**
**(Against All Defendants)**

116.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every paragraph in this Complaint as if fully set forth herei

117.    Sybac transferred its assets to MISF Solar with the actual intent to hinder, delay, or defraud Plaintiff in its effort to collect on a judgment that DK LIPA will obtain in connection with its breach of contract claim against Sybac.

118.    Defendants were aware of DK LIPA's claim at the time the PPAs were transferred to MISF Solar for $10 in July 2017.

119.    As alleged above, at the time of the secret transfer agreement, Defendants were alter egos and/or successors-in-interest of Sybac (and/or alter egos/successors-in-interest of Sybac's alter egos and successors-in-interest).

120.    Plaintiff was a future creditor at the time of the transfer.

121.    The following badges of fraud were present at the time of the transfer:

a.    The transfer of the Project was to an entity that was 50% owned by by insiders of Sybac;

b.    The insiders from Sybac retained control of the Project after the transfer was

made;

c.   The transfer was actively concealed from DK LIPA;

d.   Before the transfer, Sybac had been sued by DK LIPA;

e.   The Project was Sybac's biggest or one of its biggest assets;

f.   $10 was not reasonable consideration for the Project, which was worth millions of dollars; and

g.   Sybac was likely insolvent after the transfer was made.

122.   As a result of the foregoing, Plaintiff is entitled to avoid the conveyances and/or recover damages in the amount to be determined at trial as well as costs and legal fees together with interest, and any other relief the Court may deem just and proper, and such further relief as the Court should deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DK LIPA prays that judgment be entered against Defendants as follows:

A.   On all claims, for recovery of DK LIPA's actual damages in an amount to be determined at the time of trial;

B.   On all claims, for attorneys' fees, expenses and costs as provided for by law or contract; and

C.   For such other and further relief as the Court seems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable of right by Jury.

**DATED:**  New York, New York
June 4, 2020


By: _____
Rishi Bhandari

MANDEL BHANDARI LLP
Rishi Bhandari
A.  Leah Vickers
Donald Conklin
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600
F:  (646) 964-6667
rb@mandelbhandari.com

*Attorneys for Plaintiff DK LIPA LLC*

21

Exhibit A

## RIGHT OF FIRST OFFER AGREEMENT

This RIGHT OF FIRST OFFER AGREEMENT ("Agreement") is made as of October 11, 2013 (the "Effective Date"), by and between DK LIPA LLC, a Delaware limited liability company, with its principal place of business at 401 Greenwich Street, Suite 300, New York, NY 10013 ("DK LIPA"), and SYBAC SOLAR LLC, a Florida limited liability company, with its principal place of business at 6735 Conroy Windermere Rd., Suite 401, Orlando, FL 32835 (the "Sybac").

### RECITALS:

A.  Sybac is developing a photovoltaic solar energy generating project located in Long Island, New York with an intended power rating of 9.9 MWp AC (the "Project");

B.  Sybac intends to sell the electric power output of the Project to Long Island Power Authority ("LIPA") under a power purchase agreement (the "PPA") to be negotiated with LIPA;

C.  Sybac intends to acquire a parcel of approximately 45.0 acres in Brookhaven, Long Island, in the State of New York (the "Site") from a third party (the "Site Owner") as part of a land purchase agreement (the "Land Purchase Agreement") for the purpose of locating the Project;

D.  Sybac desires to grant DK LIPA certain rights with respect to the Project and DK LIPA desires to accept such rights, as further described below.

NOW, THEREFORE, it is agreed as follows:

1.  Definitions:

    a.  "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.

    b.  "EPC Contract" means an agreement for the provision of certain engineering, procurement and construction services entered into between the Purchaser (or an Affiliate of the Purchaser) and the Seller.

    c.  "Force Majeure" means, any act or event that delays or prevents a party from performing all or a portion of its obligations under this Agreement or from complying with all or a portion of the conditions under this Agreement if such act or event, despite the exercise of reasonable efforts by such party, cannot be avoided by, and is beyond the reasonable control of, the party relying thereon as justification for such delay, nonperformance, or noncompliance.  Without limiting the generality of the foregoing, so long as the following events satisfy the requirements set forth herein, a Force Majeure may include: (i) natural

phenomena, such as storms, hurricanes, floods, lightning and seismic activity, including earthquakes and volcanic eruptions; (ii) explosions or fires arising from lightning or other causes unrelated to the acts or omissions of the party seeking to be excused from performance; (iii) acts of war or public disorders, civil disturbances, riots, insurrection, sabotage, epidemic, terrorist acts or rebellion; (iv) national strikes or national labor disputes; and (v) action by a Governmental or Regulatory Authority, including a moratorium on any activities related to this Agreement (except with respect to Seller's failure to obtain any Permit or comply with Laws), or failure of a Governmental Authority to issue permits in a timely manner despite the diligence of Seller.  Notwithstanding anything to the contrary, a Force Majeure shall not be deemed to include: (a) Site Conditions; (b) any labor disturbance affecting either a contractor or subcontractors, to the extent that such labor disturbance involves direct employees of the contractor or subcontractors who are performing Work on the Project, except for strikes or lockouts national or regional in scope; (c) inability of a contractor to obtain equipment to construct the Project, equipment failures or acts or omissions of agents or subcontractors of a contractor, except to the extent such acts or omissions arise from a Force Majeure; or (d) any other delay, default or failure (financial or otherwise) of a subcontractor, vendor or contractor performing work on the Project, unless it would otherwise qualify as a Force Majeure hereunder.

d. "Governmental or Regulatory Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any authority, agency, department, board, commission or instrumentality of the United States, including the Internal Revenue Service, the Federal Energy Regulatory Commission and any of its regional entities, the North American Electric Reliability Corporation, LIPA, any state of the United States or any political subdivision thereof, any international or multinational agency, authority or commission, and any tribunal, court or arbitrator(s) of competent jurisdiction.

e. "Interconnection Cost" means the cost to interconnect the Project to the LIPA grid and to any upgrades to the LIPA interconnection as specified in the PPA or an Interconnection Agreement with LIPA.

f. "Land Reimbursement Amount" means the amount paid to Site Owner under the Land Purchase Agreement, including, but not limited to, any option payments, real property transfer, recording, gains, documentary, fees, taxes, assessments or other closing costs associated with such acquisition.

g. "Laws" means any applicable statute (including the Code), law (including any law relating to cultural or historic resources), rule, treaty, ordinance, code, guidance

document, regulation, rate, ruling, order, restriction, requirement, writ, injunction, decree and other pronouncements having the effect of law in the United States, the State of Florida, or any county, city or other political subdivision thereof on which the Site is located, which has been enacted, issued or promulgated by any Governmental or Regulatory Authority.

h. "Permits" means any license, consent, permit, authorization, requirement, environmental plan, filing, certification, exemption, waiver, tariff, franchise, variance, order, decision, registration, ruling and other approval or permission required under any Law for the Project, including as to zoning, road crossing, environmental protection, pollution, sanitation, energy regulation, safety, siting or building, obtained or required to be obtained by or on behalf of the Seller or the Project from any Governmental or Regulatory Authority.

i. "Person" means any individual, corporation, company, voluntary association, partnership, joint venture, labor union, trust, limited liability company, other business or similar entity or Governmental or Regulatory Authority.

2. Exclusivity Period.  The "Exclusivity Period" shall comprise the period from the Effective Date hereof until the earlier of (i) 5:00 P.M. New York time on the date that falls thirty (30) days after the day on which Sybac delivers an executed PPA and Interconnection Agreement between Sybac (or an Affiliate thereof) and LIPA, and Option to Purchase the Site with Site Owner; or (ii) the execution between DK LIPA and Sybac (or an Affiliate thereof) of a binding Purchase Agreement and EPC Contract.  The parties agree that during the Exclusivity Period, Sybac, its affiliates, and its respective officers, directors, employees, or agents shall not directly or indirectly shall not accept any offers or proposals for the purchase, acquisition, or financing of the Project.

3. During the Exclusivity Period:

   a. DK LIPA shall have the right to conduct due diligence activities to support the acquisition of Sybac's assets.

   b. The parties agree to conduct negotiations in good faith and to use commercially reasonable efforts to reach agreement on the Purchase Agreement as soon as reasonably practical, but no later than the expiration of the Exclusivity Period, as may be extended by the mutual agreement of the Parties in their sole discretion; provided that the purchase price shall be $2.80 per watt, payable in accordance with the Milestone Payment Schedule attached to the EPC Contract, subject to adjustment for unanticipated costs due to Force Majeure or unanticipated Site conditions (the "Purchase Price").

   c. The Purchase Price shall be exclusive of the following items:

    i. Land Reimbursement Amount: The Land Reimbursement Amount shall be excluded from the Purchase Price and paid directly by Purchaser to Site Host in accordance with the terms of the Land Purchase Agreement or, if paid by Seller, reimbursed to Seller. If the actual Land Reimbursement Amount is less than $5,400,000.00, Purchaser shall pay to Seller, within 10 Business Days of the payment of the Land Reimbursement Amount by Purchaser, 50% of the difference between the actual Land Reimbursement Amount and $5,400,000.00.

    ii. Interconnection Cost: The Interconnection Cost shall be excluded from the Purchase Price and paid by Purchaser to Seller in accordance with the Milestone Payment Schedule attached to the EPC Contract. If the actual Interconnection Cost is less than the amount specified in Attachment A, Purchaser shall pay to Seller, within 10 Business Days of the payment of the Interconnection Cost by Seller, 50% of the difference between the actual Interconnection Cost and the amount specified in Attachment A.

4. <u>Initial Payment</u>. Upon execution of this Agreement, DK LIPA shall pay $25,000 into an escrow account which shall be released to DK LIPA if the parties fail to execute a Purchase Agreement for the subject transaction and DK LIPA's affiliate is not in default under Prior Purchase Agreement. Otherwise, the Initial Payment shall be released to Sybac upon expiration of the Exclusivity Period and, if the Purchase Agreement has been executed, applied to the purchase price of the Project.

5. <u>Attorneys' Fees; Jurisdiction</u>. In the event of any litigation arising out of this Agreement, the court shall award the substantially prevailing party all reasonable costs and expenses including attorneys' fees. The laws of the State of New York shall govern the interpretation, validity, performance and enforcement of this Agreement.

6. <u>Assignment</u>. Neither party may assign this Agreement without the prior written consent of the other party.

7. <u>Termination of Agreement</u>. This Agreement shall terminate upon any of the following:

    a. In the event that the Purchase Agreement and EPC Contract are not executed within the Exclusivity Period;

    b. Under that certain Purchase Agreement For Prairie View Solar Array, by and between Sybac and DK Prairie View, LLC, a Delaware limited liability company, attached hereto as Attachment B (the "<u>Prior Purchase Agreement</u>"), Sybac and DK Prairie View, LLC shall have failed to achieve a Closing (as defined therein), or DK Prairie View, LLC is in default under the Prior Purchase Agreement; or

    c.  By mutual agreement of the parties.

8.  Effect of Termination.  In the event of a termination under Paragraph 7(a) above, for 36 months following termination of the Agreement, Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA.  Following receipt of such notification and for 30 days thereafter, DK LIPA shall have the one-time right to enter into and execute an EPC Contract or Purchase Agreement under terms identical in every respect to the terms agreed upon as between Sybac and the other party, except that DK LIPA may elect to modify the total consideration paid to Sybac under those agreements to be the Purchase Price.  This paragraph shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

DK LIPA, LLC

By:    WestJIC LLC, its Managing Member

By:

Name:  Halton A. Peters

Title: Managing Member of WestJIC LLC


SYBAC SOLAR LLC

By:

Name:  Artur Madej

Title: President