# EXHIBIT B

# RIGHT OF FIRST OFFER AGREEMENT

This RIGHT OF FIRST OFFER AGREEMENT ("Agreement") is made as of October 11, 2013 (the "Effective Date"), by and between DK LIPA LLC, a Delaware limited liability company, with its principal place of business at 401 Greenwich Street, Suite 300, New York, NY 10013 ("DK LIPA"), and SYBAC SOLAR LLC, a Florida limited liability company, with its principal place of business at 6735 Conroy Windermere Rd., Suite 401, Orlando, FL 32835 (the "Sybac").

## RECITALS:

A. Sybac is developing a photovoltaic solar energy generating project located in Long Island, New York with an intended power rating of 9.9 MWp AC (the "Project");

B. Sybac intends to sell the electric power output of the Project to Long Island Power Authority ("LIPA") under a power purchase agreement (the "PPA") to be negotiated with LIPA;

C. Sybac intends to acquire a parcel of approximately 45.0 acres in Brookhaven, Long Island, in the State of New York (the "Site") from a third party (the "Site Owner") as part of a land purchase agreement (the "Land Purchase Agreement") for the purpose of locating the Project;

D. Sybac desires to grant DK LIPA certain rights with respect to the Project and DK LIPA desires to accept such rights, as further described below.

NOW, THEREFORE, it is agreed as follows:

1. Definitions:

    a. "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.

    b. "EPC Contract" means an agreement for the provision of certain engineering, procurement and construction services entered into between the Purchaser (or an Affiliate of the Purchaser) and the Seller.

    c. "Force Majeure" means, any act or event that delays or prevents a party from performing all or a portion of its obligations under this Agreement or from complying with all or a portion of the conditions under this Agreement if such act or event, despite the exercise of reasonable efforts by such party, cannot be avoided by, and is beyond the reasonable control of, the party relying thereon as justification for such delay, nonperformance, or noncompliance. Without limiting the generality of the foregoing, so long as the following events satisfy the requirements set forth herein, a Force Majeure may include: (i) natural

HAP

phenomena, such as storms, hurricanes, floods, lightning and seismic activity, including earthquakes and volcanic eruptions; (ii) explosions or fires arising from lightning or other causes unrelated to the acts or omissions of the party seeking to be excused from performance; (iii) acts of war or public disorders, civil disturbances, riots, insurrection, sabotage, epidemic, terrorist acts or rebellion; (iv) national strikes or national labor disputes; and (v) action by a Governmental or Regulatory Authority, including a moratorium on any activities related to this Agreement (except with respect to Seller's failure to obtain any Permit or comply with Laws), or failure of a Governmental Authority to issue permits in a timely manner despite the diligence of Seller.  Notwithstanding anything to the contrary, a Force Majeure shall not be deemed to include: (a) Site Conditions; (b) any labor disturbance affecting either a contractor or subcontractors, to the extent that such labor disturbance involves direct employees of the contractor or subcontractors who are performing Work on the Project, except for strikes or lockouts national or regional in scope; (c) inability of a contractor to obtain equipment to construct the Project, equipment failures or acts or omissions of agents or subcontractors of a contractor, except to the extent such acts or omissions arise from a Force Majeure; or (d) any other delay, default or failure (financial or otherwise) of a subcontractor, vendor or contractor performing work on the Project, unless it would otherwise qualify as a Force Majeure hereunder.

d. "Governmental or Regulatory Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any authority, agency, department, board, commission or instrumentality of the United States, including the Internal Revenue Service, the Federal Energy Regulatory Commission and any of its regional entities, the North American Electric Reliability Corporation, LIPA, any state of the United States or any political subdivision thereof, any international or multinational agency, authority or commission, and any tribunal, court or arbitrator(s) of competent jurisdiction.

e. "Interconnection Cost" means the cost to interconnect the Project to the LIPA grid and to any upgrades to the LIPA interconnection as specified in the PPA or an Interconnection Agreement with LIPA.

f. "Land Reimbursement Amount" means the amount paid to Site Owner under the Land Purchase Agreement, including, but not limited to, any option payments, real property transfer, recording, gains, documentary, fees, taxes, assessments or other closing costs associated with such acquisition.

g. "Laws" means any applicable statute (including the Code), law (including any law relating to cultural or historic resources), rule, treaty, ordinance, code, guidance

document, regulation, rate, ruling, order, restriction, requirement, writ, injunction, decree and other pronouncements having the effect of law in the United States, the State of Florida, or any county, city or other political subdivision thereof on which the Site is located, which has been enacted, issued or promulgated by any Governmental or Regulatory Authority.

h. "Permits" means any license, consent, permit, authorization, requirement, environmental plan, filing, certification, exemption, waiver, tariff, franchise, variance, order, decision, registration, ruling and other approval or permission required under any Law for the Project, including as to zoning, road crossing, environmental protection, pollution, sanitation, energy regulation, safety, siting or building, obtained or required to be obtained by or on behalf of the Seller or the Project from any Governmental or Regulatory Authority.

i. "Person" means any individual, corporation, company, voluntary association, partnership, joint venture, labor union, trust, limited liability company, other business or similar entity or Governmental or Regulatory Authority.

2. Exclusivity Period. The "Exclusivity Period" shall comprise the period from the Effective Date hereof until the earlier of (i) 5:00 P.M. New York time on the date that falls thirty (30) days after the day on which Sybac delivers an executed PPA and Interconnection Agreement between Sybac (or an Affiliate thereof) and LIPA, and Option to Purchase the Site with Site Owner; or (ii) the execution between DK LIPA and Sybac (or an Affiliate thereof) of a binding Purchase Agreement and EPC Contract. The parties agree that during the Exclusivity Period, Sybac, its affiliates, and its respective officers, directors, employees, or agents shall not directly or indirectly shall not accept any offers or proposals for the purchase, acquisition, or financing of the Project.

3. During the Exclusivity Period:

    a. DK LIPA shall have the right to conduct due diligence activities to support the acquisition of Sybac's assets.

    b. The parties agree to conduct negotiations in good faith and to use commercially reasonable efforts to reach agreement on the Purchase Agreement as soon as reasonably practical, but no later than the expiration of the Exclusivity Period, as may be extended by the mutual agreement of the Parties in their sole discretion; provided that the purchase price shall be $2.80 per watt, payable in accordance with the Milestone Payment Schedule attached to the EPC Contract, subject to adjustment for unanticipated costs due to Force Majeure or unanticipated Site conditions (the "Purchase Price").

    c. The Purchase Price shall be exclusive of the following items:

H AP

AY

      i. Land Reimbursement Amount: The Land Reimbursement Amount shall be excluded from the Purchase Price and paid directly by Purchaser to Site Host in accordance with the terms of the Land Purchase Agreement or, if paid by Seller, reimbursed to Seller. If the actual Land Reimbursement Amount is less than $5,400,000.00, Purchaser shall pay to Seller, within 10 Business Days of the payment of the Land Reimbursement Amount by Purchaser, 50% of the difference between the actual Land Reimbursement Amount and $5,400,000.00.

      ii. Interconnection Cost: The Interconnection Cost shall be excluded from the Purchase Price and paid by Purchaser to Seller in accordance with the Milestone Payment Schedule attached to the EPC Contract. If the actual Interconnection Cost is less than the amount specified in Attachment A, Purchaser shall pay to Seller, within 10 Business Days of the payment of the Interconnection Cost by Seller, 50% of the difference between the actual Interconnection Cost and the amount specified in Attachment A.

4. **Initial Payment.** Upon execution of this Agreement, DK LIPA shall pay $25,000 into an escrow account which shall be released to DK LIPA if the parties fail to execute a Purchase Agreement for the subject transaction and DK LIPA's affiliate is not in default under Prior Purchase Agreement. Otherwise, the Initial Payment shall be released to Sybac upon expiration of the Exclusivity Period and, if the Purchase Agreement has been executed, applied to the purchase price of the Project.

5. **Attorneys' Fees; Jurisdiction.** In the event of any litigation arising out of this Agreement, the court shall award the substantially prevailing party all reasonable costs and expenses including attorneys' fees. The laws of the State of New York shall govern the interpretation, validity, performance and enforcement of this Agreement.

6. **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party.

7. **Termination of Agreement.** This Agreement shall terminate upon any of the following:

    a. In the event that the Purchase Agreement and EPC Contract are not executed within the Exclusivity Period;

    b. Under that certain Purchase Agreement For Prairie View Solar Array, by and between Sybac and DK Prairie View, LLC, a Delaware limited liability company, attached hereto as Attachment B (the "Prior Purchase Agreement"), Sybac and DK Prairie View, LLC shall have failed to achieve a Closing (as defined therein), or DK Prairie View, LLC is in default under the Prior Purchase Agreement; or

   c. By mutual agreement of the parties.

8. Effect of Termination. In the event of a termination under Paragraph 7(a) above, for 36 months following termination of the Agreement, Sybac must notify DK LIPA within 3 business days of a written offer from a party other than DK LIPA. Following receipt of such notification and for 30 days thereafter, DK LIPA shall have the one-time right to enter into and execute an EPC Contract or Purchase Agreement under terms identical in every respect to the terms agreed upon as between Sybac and the other party, except that DK LIPA may elect to modify the total consideration paid to Sybac under those agreements to be the Purchase Price. This paragraph shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

DK LIPA, LLC

By: WestJIC LLC, its Managing Member

By: _____
Name: Halton A. Peters
Title: Managing Member of WestJIC LLC


SYBAC SOLAR LLC

By: _____
Name: Artur Madej
Title: President